This case on the calendar is Carrier v. Pure Bio Fuels. Good morning, Your Honors. May it please the Court, my name is Christopher Sputis and I'm here on behalf of the Plaintiff Appellants Liana Carrier Ltd. and Amir Ramon. Today I'd like to address four errors in the District Court's two decision and orders in denial of the Appellant's letter request for leave to amend. I'd like to first address the lower court's lack of authority to dismiss all counts of the complaint with prejudice. The court first dismissed count one of the complaint, which was the securities fraud claim with prejudice, and then concluded that in the absence of federal question jurisdiction over the state court breach of contract claim, it didn't have jurisdiction over that claim and then declined to take supplemental jurisdiction over the remaining claims. And then dismissed all counts of the complaint with prejudice. Just last year this court reaffirmed that where a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice. That was in the JetBlue case. This was a critical error by the District Court because a dismissal with prejudice of all the claims acts as a final adjudication on the merits of all the plaintiff's claims. Those claims should have been dismissed without prejudice is your argument. Yes, Your Honor. I'd also just like to quickly bring to the court's attention that the appellees in this matter expressly took no position on this issue. So just to sum up on this point, we believe the court had no jurisdiction to dismiss the state law claims with prejudice when it made the determination that it did not have subject matter jurisdiction over those claims. The second issue I'd like to address is somewhat related to the first. And as I mentioned, the District Court concluded it didn't have federal question jurisdiction over the appellant's state law breach of contract claim. And I raise this point only to address the Supreme Court's recent holding in Manning, which was, I'm sorry, Merrill Lynch v. Manning, which came out soon after our initial brief. Now the appellees have argued that Manning outright rejects our position and we disagree. In Manning, the court held that federal question jurisdiction arises when a plaintiff's claim rises or falls on a violation of federal law or the plaintiff's ability specifically to prove violation of a federal duty. Now here our contract- Did the court in Manning decline to decide the question whether the claims in that case arose under federal law for the purposes of federal question jurisdiction? That's correct, Your Honor. And that court sort of took a middle road between the two parties' positions and seemed to say that, well, you can't just throw violation of federal law into your complaint atmospherically and that's your ticket to federal court. However, if your claim rises or falls on whether or not there was a violation of federal law, then federal question jurisdiction may lay. In our case, the breach of contract claim necessarily depends on a showing that the defendant breached federal law, specifically a violation in the provision of the subscription agreement that represented that the defendant pure biofuels represented that it complied with the Exchange Act. And so we feel that under Manning, the district court would have jurisdiction over our breach of contract claim. And in fact, in Manning, the court specifically addressed cases in which a state court cause of action is brought to enforce a duty under the Exchange Act. The third point I wanted to address is a procedural one, and it relates to the lower court's use of a procedure in which the- I want to go back to this for a second. The contract said that they would comply with federal law, right? Yes, Your Honor. So how does federal law become like the centerpiece of it other than the fact that they just agreed to do what the law requires them to do? Well, it's really specific as to whether they violated the Exchange Act and how they violated the Exchange Act. The claim is either going to rise or fall on that exact point. And so it wasn't just thrown in there- Well, it's not a claim arising out of the breach of violation of federal law. It's a claim arising out of a breach of a promise to follow a certain standard. Yes. So you just have a standard that happens to be federal securities law. I don't see how that federalizes it. You could federalize any state law claim then by simply agreeing to a federal standard and say, okay, now we're in federal court. I mean, that would eviscerate the jurisdiction. I mean, it would just make federal jurisdiction all-inclusive. If you didn't like state courts, you could just bump yourself up to federal court, if that's considered up, I guess. I don't know. And I understand that, Your Honor. Well, yeah, so give me an answer. What I think is that there's a difference between just a contract saying that we complied with federal law and whether the court needs to actually make a determination as to the interpretation of that federal law. Let me ask you a question. If it said about a car, we're going to sell you a car, and the car is going to comply with all federal safety standards, is that a federal claim or a state claim? I would say that that's a federal claim, unless there's your vet— There you go. Now you've opened the floodgates. Yourself, your own answer is exposed. So you're saying that anything that imposes a federal standard federalizes the claim? No, sorry. Your Honor, I misspoke. I meant to say it's a state law claim. That would be state law. Unless the claim specifically rises or falls on the interpretation of the federal law. That's the distinction I'm making. State courts do that all the time. How are those two cases, how is your case distinct from the hypothetical that Judge Wesley just gave you? Because I think you need to, and the Manning Court says this, I think you really need to look at exactly what the claim is. And in our claim, and the court specifically says there are rare cases where, and we'll admit this is one of those rare cases where there is a carve-out. And in this case, the Manning Court specifically referred to the Exchange Act. And what we're saying is that there was a specific violation of the Exchange Act. How did they breach federal law? That's the other part of your claim, which is why you were in federal court. And that's where I thought you were going to start this conversation. I mean the prejudice thing. I don't blame you for starting with that because you want to make sure that we're cued into that and your opponents haven't really contested that. So that's fair game. I get that. But why aren't you talking about your federal claims here? I mean because if you lose on this and don't spend any time on your federal claims, you're in state court for certain. So tell me why the district court was wrong in not allowing you to amend your complaint. On the federal question issue? Yeah, on the federal claims. Well, I think, Your Honor, broadly. Particularly with regard to the derivative claims that you felt you could have raised. Well, Your Honor, there's many reasons why we thought the court erred in not allowing us to. I know that, but I was fairly specific. So let's talk about the derivative claims. Why do you think that they could have been raised and, A, that their availability made the misrepresentations material and a cause of your injury? Well, because we lost our state court rights because of the omissions that were made in the public filings. So, you know, over the course of I think it was about two years, there were several misrepresentations and omissions that were made in public filings. Then the merger occurred. By that time, and we didn't find out that these were material omissions until two years after the merger. So by that time, those events had already taken place. We had lost all of our state law remedies under Nevada law that we had, such as not just a derivative claim, injunctive relief. We could have filed breach of fiduciary claims. We could have enjoined the merger. But by then it was way too late. And I think where the court went astray was. . . How do you, my problem with that argument is how do you adequately allege but for causation if that's the theory? Because by the time the merger occurs, and you don't contest this, your client had no ability to stop the merger. So if I understand your argument correctly, and correct me if I'm misunderstanding it, you say that the nondisclosure of these conflicts of interest in connection with the financing transactions, if you'd known about them, you could have brought these derivative claims back then. But there's a lot of jumps between the bringing of those claims, even assuming those statements were misrepresentations and that you'd gone forward with those claims, and a company engaging or not engaging in a merger some years later. The company was in need of financing and presumably would have sought financing in any event, and your client's shares could have been diluted by virtue of that. That's true, Your Honor. However, in cases of nondisclosure, and we've highlighted some of them in the brief, we need to show the materiality of the nondisclosure as the link between the nondisclosures, the loss of our state court remedies, and then the merger that squeezed us out. And I think it was the Madison Consultants case in which the court held, this court held that withheld information is material, where the plaintiffs would have had some reasonably effective means of protecting themselves against loss had they known the truth about the defendant's concealed plans. Madison kind of material ends up bleeding on over into the causation analysis, right? It does, Your Honor. And I'll speak more specifically as to the but-for analysis. This court also held, and I think it was in the Lentel v. Merrill Lynch case, that transaction causation is akin to reliance and only requires an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction, the detrimental securities transaction here being the forced sale. And I guess that winds into the Vine analysis where, and in Vine— Vine had no power to interfere with the statutory merger, right? Well, interfere in what way, Your Honor? We had no power— You had no power to oppose it. Your only rights were appraisal rights under that. Is that right? Under Nevada law, we had—no, there was a wide array of remedies that we could have exercised. We could have— To prevent the merger from occurring? Yes, Your Honor. We could have filed an injunctive action. We could have filed a derivative action. And there's also our appraisal rights, but there are other rights under Nevada law that we were prevented from exercising because of the omissions that we didn't know about until well after the merger took place. Because of the omissions or because you had less than 10 percent of the stock? Well, there is a direct link between the two because the acquisition of the requisite amount of shares in order to effectuate the short-term merger were accomplished through the material omissions. Unlike the Virginia Bank share of Grayson— By purchases from someone other than your clients? I'm sorry, Your Honor? By purchases from someone other than your clients? Yes, Your Honor. Yes. But I guess the point is that— Did you have the right to interfere with those transactions? We did not, Your Honor, no. But they weren't properly disclosed to us. So if they were disclosed properly in the filings, then we would have been able to take some action. But the fact that they were never disclosed, obviously we didn't take action because we didn't know about them. And I think that that's the critical distinction between our case and our facts and the line of the Virginia Bank share, Santa Fe and Gray's line of cases where the misrepresentations were made at a time where the company making them or the misrepresenter making them already had the requisite amount of shares. In our case, they didn't have them. The omissions were necessary to acquire that amount. But they also didn't acquire them from you. They did not acquire them from us, Your Honor, in this case, no. I realize you're red lights on. And with Judge Lewis's indulgence, let me ask you this. Your allegation of misrepresentation is that, well, there was disclosure of the fact that the debt financing could effectuate on default a transfer of shares. There was that disclosure, right? There was, Your Honor. Okay. That there was something more that wasn't disclosed, and that was that there was absolutely no intention to pay on the debt. And so, therefore, it was itself a scheme to allow a corporation or an individual to accumulate enough shares to then have control of it to then effectuate the merger, which then cut you guys off. You have that exactly right, Your Honor, except it was more egregious than that. The CEO of the company was also the owner of the company that was the financing companies, actually two of them. So you had both sides. You're on both sides. You're intentionally defaulting. But you knew that, too, did you not? No, Your Honor. There was no disclosure of the ownership of the financing company? No, Your Honor. That was the critical ownership. And also part of your claim, then, that the failure to disclose his participation on both sides was material? Yes, Your Honor. All right. Now, let me ask you a question. Did the debt deals themselves pose a threat to just the existence of the debt deals? Did that pose a threat to the minority shareholders all along prior to default? You had exposure there as a result of the debt deals, did you not? In terms of dilution? Yes. Yes, Your Honor. All right. Did the debt deals then, could the debt deals, even without the disclosure, served as a basis for a derivative action, that the debt deals themselves constitute a breach of fiduciary duty because of the danger that it represented to the minority shareholders? I'm not sure about the danger to the minority shareholders. What I would say— It was clear, though, that the debt deals themselves, on default, would present a situation in which your interest in the company would be diluted substantially. Yes, Your Honor. And they were financially unreasonable, and in some cases the transactions really had no legitimate business purposes. I know that. I know that. But I'm just talking about in terms of what was disclosed. Correct? So all my questions presumed only what was disclosed, not what wasn't disclosed. They did themselves, the deals themselves, did represent a threat to a diminution or dilution of your client's interest in the corporation, did they not? They did. Okay. Fair enough. Thank you. Good morning. May it please the Court, Ronald Lefton of Greenberg Traurig for the appellees. The appellant has advanced two arguments that would change the contours of the reach of 10b and 10b-5 and would completely crash the balance between federal and state court jurisdiction. Judge Wesley has already pointed one out with regard to the breach of contract claim, and I'd like to focus on the failure to state a claim and the correctness of Judge Marrero's decision and the exercise of his discretion to not allow leave to amend. You don't offer anything in support of the dismissal of the state law claims with prejudice, though, do you? Your Honor, we took no position on that issue in our brief, and I think that there is ample law to support the appellant's position that the court, having dismissed the only basis for federal court jurisdiction, should not have reached the state law claims. The appellants argue that there was some misrepresentation in the form of an omission in connection with financing transactions engaged in by the company and FDS and Plainfield. At the time of the very first transaction, Plainfield owned almost 60% of the outstanding stock of pure biofuels. It controlled the board of directors, and the allegation is that Mr. Pinto and FDS did not disclose to the other members of the board of directors, other than the Gorizetta brothers, who were also board members and alleged to be scheme participants, that Mr. Pinto had an ownership interest in FDS. I don't know if that is material or not. I would say not. But if it is, in fact, a related party transaction, I would say so what? What is fully disclosed in all the SEC filings is that the transaction occurred, the terms of the transaction, how much was loaned in consideration for what, the payment terms, the default terms, what would happen upon default, and the participation of FDS and the much larger participation on a percentage basis of Plainfield, also an insider. I wanted to ask you about that. Was it clear? That's why I was very careful with what I asked your opponent. Is it clear that the exposure for possible diminution of the minority shareholder's interest was disclosed because of the financing arrangements and what would occur in the event of default and how Plainfield would benefit from that? Yes, sir, completely clear, and I think the appellants concede that they knew they could be diluted. If there was the requirements of a claim under 10B, which is under a short-form merger, where there is no vote by the minority shareholders, no opportunity by the minority shareholders to stop it, and the only right under Nevada state law is appraisal unless they can show fraud in that merger transaction. They could have sued derivatively on a breach of fiduciary duty and stopped it, couldn't they? To stop the merger? No, to stop even the issuance of the debt. To stop the financing transactions. So those financing transactions were two years earlier, a year after the company. I did not hear what you said because you turned away from me. Oh, I apologize, Your Honor. I said the financing transactions were two years earlier, in one case three years earlier, and the company had been dark for a year because it didn't meet the requirements, and they could have brought, at that time, upon the disclosure of the dilution, a breach of fiduciary duty claim, and indeed, even today, the first point that appellant makes is that their breach of fiduciary duty claims arising from those very transactions should not be dismissed with prejudice so they can assert them in state court. Well, they have those claims. They have not forfeited them. So you did disclose the risk, but if they had the ability to plead that, indeed, you were going to manipulate the process such that the default terms would be effectuated, wouldn't that, if they were able to plead that with the particularity that's necessary, wouldn't that plead a claim for 10b-5 because, as you just told me, they could have brought the derivative action at the time of the disclosure, the time of the debt transaction as a disclosure. So they knew they had some exposure from it, and if, indeed, there are facts which show that, indeed, there was an intention to eventually default on these such that it would effectuate a diminution of the value, wouldn't that be both material and be a proximate cause of their injury? To that transaction, perhaps, Your Honor, but not to the short-form merger, which is the basis of their federal claim today. So their only federal claim that they assert today arises from the short-form merger, which is a separate transaction, and it's imperative to remember that there were some superseding events so that I mentioned that Plainfield, who participated in those financing transactions, who is disclosed as a related party, who controlled the Board of Directors, participated in the same percentage basis as did FDS, and their stock interest went from 60% to 75%. So the concentration that the appellants complained about was really with Plainfield. Plainfield did not effectuate the merger. Indeed, as part of the merger transaction, Plainfield sold its stock interest to PCB. Let's go over that again. Surely. I'm not certain I agree with you that their claim arises out of the merger. I think their claim arises out of the misrepresentation of the effect of what was going on with regard to the issuance of the debt. But put that to the side. Go ahead. So you say that as pled, Plainfield did not effectuate the merger. Correct. And then what happens? So the merger is effectuated by PCB. I'm sorry, PBC. And the real complaint, as you see from the allegations of the original complaint and in both of their letters after the dismissal of the complaint, is that the operating entity was acquired by an investment fund by the name of Pegasus. And Pegasus owns Pure Biofuels Holdings. LP, one of the defendants who they claim has successor liability for having taken over Del Peru, the operating entity. Pegasus was not part of those financing transactions at all. So you have these two superseding events. And that, to the extent there was any transaction causation theoretically, and I say there was none, it's broken by those two events. The merger transaction is what they rely upon to invoke federal court jurisdiction. That's what they asserted before Judge Marrero at the time of opposing the motion to dismiss, and in the two subsequent letters. They tried to link it back to the financing transactions, but, Your Honor, those were separate transactions. I have not mentioned Trimarine. It's incorrect for appellants to say that there was no disclosure of the related party relationship with Trimarine. Mr. Pinto is described in the public filings as being the owner of Trimarine. So that's not an issue. So you're talking about the financing transactions in 2009 and 2010 regarding FDS, all fully disclosed, not part of the essential link to the merger. And if they have a breach of fiduciary duty claim, they could have asserted it. They did in this lawsuit, but they did not years earlier, although on notice. And even now they don't say how they learned this information. They don't identify who formulated the scheme, when the scheme was formulated, the parameters of the scheme, how they now, when the scheme was to be implemented, and how they learned about it and why they waited all this time. Unlike Wilson, where a right to appraisal was forfeited because the plaintiffs relied on the proxy information and tendered their shares to participate despite the not knowing of the false valuation, here the plaintiffs haven't done anything. They did not tender their shares or take the cash. They just sat back and waited, unless there are more questions. Thank you, Your Honors. Very briefly, Your Honor. Just for clarity, the FDS, which was owned by Mr. Pinto and that was never disclosed, TriMarine and another company, all were part of the financing transactions. Through about two years, they accumulated the requisite amount of shares through these financing transactions. Then there was a company named PBC Acquisitions that was formed two years ago. FDS and Plainfield sold their stock to PBC, right? Exactly, Your Honor, and I would not call those. And FDS is owned by? Mr. Pinto. Okay, and Pinto has an interest in Plainfield, too, or no? Not that we're aware of, no. Okay, all right. But FDS is on the other side of some of these debt deals, right? Yes, Your Honor. All right, go ahead. And so PBC acquires the 90% and then the short-form merger is effectuated. So I wouldn't say that those are intervening events. They are all on the timeline of the fraudulent events that occurred starting in 2009 and ending up with the merger. And they needed 90% to effectuate the merger without your being able to intervene under Nevada law, right? That's correct, Your Honor. So without the 20% from FDS that went into PBC, they'd be short because Plainfield had 70%. Exactly, Your Honor. So you say that makes it material in the sense because of FDS's position? It does, Your Honor. In the deals? And if you look at what the Vine Court says, the Vine Court said specifically that if the transaction causation was established because the appellant would never be in the position of a forced seller but for the fraud. So it's not limited to just instances where the misrepresentation is in the merger document or in the proxy statement or anything like that. Isn't Vine different, though? Because there the allegation was that there was a class of Class A public stockholders who were deceived in connection with the merger, forcing another Class B to become a seller. So here any deception occurred in connection with financing transactions that occurred long ago or fairly long ago. And you have to sufficiently allege but for causation. That was much easier in Vine. It was much easier in Vine, Your Honor. It's no less true here, though, just because the timeline's a bit longer. But the key issue is the acquisition of the requisite amount, and that's why we are more Vine plaintiffs than Virginia, Bankshire, Greece, or Santa Fe plaintiffs. Thank you, Your Honor. Thank you both. Well argued.